

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | | |
|---|---|---|---|
| ELIJAH COVINGTON, | | | |
| | Appellant, | § | No. 08-23-00176-CR |
| v. | | | Appeal from the |
| | | § | |
| | | | 384th Judicial District Court |
| THE STATE OF TEXAS, | | | |
| | | § | Of El Paso County, Texas |
| | Appellee. | | |
| | | | (TC# 20210D02752) |

## MEMORANDUM OPINION

A jury found Appellant Elijah Covington guilty of one count of murder in the shooting death of Jamaal Jones-Aguilar and sentenced him to 29 years in prison. Appellant contends the evidence was insufficient to support his conviction and urges that his sentence be reformed to reflect a conviction for the lesser-included offense of criminally negligent manslaughter. For the reasons set forth below, we affirm the trial court's judgment.[1]

---

[1] We note that the trial court has certified Appellant's right to appeal in this case, but the certification does not bear Appellant's signature as required by Tex. R. App. P. 25.2(d). Accordingly, pursuant to Rule 48.4 of the Texas Rules of Appellant Procedure, the Court ORDERS Appellant's attorney to send Appellant a copy of this opinion and this Court's judgment to notify Appellant of his right to file a pro se petition for discretionary review and inform Appellant of the applicable deadlines. *See* Tex. R. App. P. 48.4, 68. The Court further ORDERS Appellant's attorney to comply with all Rule 48.4 requirements.

# FACTUAL AND PROCEDURAL BACKGROUND

## A. The shooting

On September 1, 2019, Appellant was at the "Dirty Sanchez" club, also known as Gourmet Hot Dogs, in El Paso with several friends, including Melek Decquir (Melek) and Jonathan Jackson (Rico). At some point that day, Appellant, Melek and Rico, who had been drinking since early afternoon, were ejected from the club by security staff after they were found smoking cigars in the club's patio area.[2]

Appellant and Rico thereafter went to Appellant's vehicle, which was parked in the rear of the club's parking lot, where they remained for several hours, vomiting and suffering the effects of excessive alcohol consumption. Melek, however, reentered the club and became embroiled in an argument with a group of males, including the victim, Jamaal Jones-Aguilar. While inside the club, Melek called Rico on his cell phone, asking for assistance, as he was in fear for his safety, thinking the men were going to "jump him." At approximately 11:00 p.m., the security staff in the club removed both Melek and the group of males from the club. The confrontation between them continued in the club's parking lot with a security guard, Eduardo Vasquez (Vasquez), present. During this time, Appellant answered Melek's call for help and drove with Rico to the front of the parking lot where the confrontation was ongoing.

Vasquez testified that during the confrontation in the parking lot, he observed Melek and Jones-Aguilar punch—or attempt to punch—each other at various times. Vasquez was able to separate them, but the confrontation continued with the various individuals "talking shit to each

---

[2] Rico testified at trial that they were smoking marijuana, but Appellant and Melek testified that they were smoking cigars.

other." Vasquez observed Appellant pull up to the scene in a black Jeep and exit the vehicle holding an AR-15 rifle. Vasquez recalled Melek turning and saying something to Appellant, but he did not testify as to what he heard, if anything. Jones-Aguilar took a step toward Melek and punched him in the head. According to Vasquez, Appellant then fired one round from the AR-15, which struck Jones-Aguilar, who fell to the ground. Appellant thereafter shot up to seven rounds into the air, with several individuals nearby, causing them to run for safety. Appellant later explained to the police that shooting Jones-Aguilar was an accident and that his intent was to de-escalate the situation.

Vasquez and others attempted to assist Jones-Aguilar, but he passed away at the scene from a fatal gunshot wound to his head. Immediately after the shooting, Appellant and Rico fled from the scene, going to an apartment they shared.

During its case in chief, the State played for the jury a very short video of the confrontation and shooting, which a bystander recorded on his cell phone.[3] The recording demonstrated that Appellant was holding an AR-15 and standing next to Melek and Rico in a crowd of people, when an unidentified male confronted Melek. Appellant shouted at the man and then pushed him, prompting Vasquez to intervene by standing between them. At that point, Jones-Aguilar approached and struck Melek in the head with his fist. As Melek swung back, Appellant pointed the gun at Jones-Aguilar and fired one bullet into his head. Appellant fired three to four shots into the air before the video abruptly ended.

---

[3] Vasquez acknowledged that certain events he described involving the parking lot confrontation during did not appear on the video.

## B. Appellant's arrest and police interview

After the police learned that the vehicle involved in the shooting was registered to Appellant, a warrant was issued for his arrest, and he was brought in for questioning two days later, on September 3, 2019. The State played the video of Appellant's interview for the jury.

During the interview, Appellant initially denied that he was at the Dirty Sanchez the day of the shooting but later admitted he had been there and consumed a large amount of alcohol.[4] He recalled that after being ejected from the club, he went to his vehicle in the back of the club's parking lot and was trying to sober up. After receiving the call, he drove to the front where he observed a confrontation in the parking lot. He informed the officers that he believed his cousin was involved, and his intent was to assist his cousin. However, when he arrived there, he panicked and shot his AR-15 into the air, as a means of trying to diffuse the situation.[5] Appellant claimed he did not realize at the time that he had shot anyone and that he blacked out before driving away. Appellant informed police that he learned from the news the next day that Jones-Aguilar had been shot during the confrontation. However, he repeatedly claimed he did not intend to shoot Jones-Aguilar, and the shooting was an accident; he only intended to use the rifle de-escalate the situation by shooting in the air.

Appellant admitted to police that the day after the accident, he took his license plates off his vehicle and drove to Las Cruces where he left the vehicle. He further told police that he gave his rifle to "some random Mexicans" at a park in Northeast El Paso the following day to "get rid

---

[4] At trial, Appellant explained that he initially failed to tell the police the truth regarding what occurred on the night of the shooting because he was scared.

[5] Appellant testified that he had purchased the AR-15 in July of 2019 after the Wal-Mart shooting, out of fear for his safety as he frequented the same Wal-Mart where the shooting occurred.

of it." And finally, he told police that he used Rico's credit card the day after the shooting to purchase a bus ticket to San Antonio to leave "as soon as possible."

## C. The indictment

Appellant was indicted on one count of murder and one count of deadly conduct, but the State later dismissed the deadly conduct charge. The indictment alleged three alternative manner and means by which Appellant committed the murder: (1) he intentionally and knowingly caused the death of Jamaal Jones-Aguilar by shooting him with a firearm; (2) he acted with the intent to cause bodily injury to Jones-Aguilar, by committing an act clearly dangerous to human life that caused serious bodily injury resulting in the death of Jones-Aguilar by shooting him with a firearm; and (3) he caused Jones-Agular's death in the course of intentionally and knowingly committing the felony offense of deadly conduct by holding a firearm with his finger on the trigger and discharging the firearm into a crowd of individuals.

## D. Appellant's defense

At trial, Appellant acknowledged that he shot Jones-Aguilar but claimed he did not do so intentionally or knowingly, and instead the shooting was an accident. According to Appellant, prior to the shooting, he had been in his vehicle with Rico after being ejected from the Dirty Sanchez, when he answered a call from Melek on Rico's phone. In the call, Melek asked him to "come now," sounding "panicked," saying that someone was "trying to get [him]." Appellant recalled driving to the front of the parking lot where he saw a large group of people involved in a confrontation. According to Appellant, he left his vehicle carrying his AR-15 with the intent to "de-escalate everything" and to "scare everybody off." Although he could not recall the details of what occurred next due to being "highly intoxicated," he acknowledged that he was holding the

5

rifle when it discharged and that a bullet from the rifle struck Jones-Aguilar. Appellant further acknowledged that because he was holding the rifle, he must have been the one who pulled the trigger—even though he did not specifically recall having his fingers on the trigger at the time. He also admitted to subsequently firing six or seven rounds into the air despite knowing other people were standing around him, again explaining he was trying to "scare everyone away." Appellant testified that he felt remorseful the next day when he found out Jones-Aguilar had died, and he gave his rifle to a friend the next day, telling his friend he "didn't want to have anything to do with it."

At trial, Melek testified to much of the same version of events as Appellant, recalling that he phoned Rico on his cell phone seeking assistance during the confrontation but claiming he did not ask Appellant to bring a firearm or provide any instructions to shoot Jones-Aguilar. Melek further testified that he did not observe Appellant aim the rifle at Jones-Aguilar, but he acknowledged that the shooting happened so quickly, he did not recall even seeing the rifle. Rico also testified to much of the same chain of events as Appellant and Melek did, also testifying that he did not hear Melek direct Appellant to shoot anyone at the scene, and he did not believe the shooting was planned.

**D. The jury's verdict**

Following the State's presentation of evidence, and again at the close of Appellant's case, defense counsel moved for a directed verdict, arguing there was insufficient evidence to support a finding that he had the requisite mental state to commit murder. The trial court denied Appellant's motion on both occasions.

The jury charge provided an instruction on the elements of murder and instructed the jury that if it found the State did not prove beyond a reasonable doubt that Appellant was guilty of murder, it could consider whether the evidence established that Appellant was guilty of the lesser-included offenses of manslaughter and criminally negligent manslaughter. The jury returned its verdict finding Appellant guilty of murder as alleged in the indictment and sentenced him to 29 years in prison. Appellant then filed a motion for new trial, arguing the jury's verdict was "contrary to the law and evidence." After the motion was denied by operation of law, Appellant appealed from his judgment of conviction.

## ISSUES ON APPEAL

Appellant raises two related issues on appeal: (1) there was legally insufficient evidence to support an inference that he acted with the requisite mens rea to support a murder conviction, and the trial court therefore erred by denying his motions for a directed verdict; and alternatively, (2) we should reform his judgment to reflect a conviction for the lesser-included offense of criminally negligent homicide.

## SUFFICIENCY OF THE EVIDENCE

### A. Standard of review

Under the Due Process Clause of the U.S. Constitution, the State is required to prove every element of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). In reviewing the sufficiency of the evidence to support a conviction, we apply the legal sufficiency standard as articulated by the U.S. Supreme Court in *Jackson v. State. See Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex. Crim. App. 2010); *see also Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). Under that standard, we view the evidence "in the light most

favorable to the verdict" and recognize that because the jury is the "sole judge of the witnesses' credibility and the weight to be given their testimony," we must defer to the jury's credibility and weight determinations. *Brooks*, 323 S.W.3d at 899–900 (citing *Jackson*, 443 U.S. at 319). We therefore may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact-finder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *see also Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014) (holding that a reviewing court should not act as a "thirteenth juror" by overturning a jury's credibility and weight determinations).

In addition, it is firmly within the jury's province to resolve conflicts in testimony, and we must therefore presume the jury resolved any conflicting inferences in favor of the verdict. *Dobbs*, 434 S.W.3d at 170 (citing *Jackson*, 443 U.S. at 319). "This standard gives full play to the responsibility of the factfinder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018) (quoting *Jackson*, 443 U.S. at 319). A jury's verdict will therefore be upheld if any rational juror could have found the essential elements of the offense beyond a reasonable doubt. *Salinas v. State*, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005).

It is also well-established that in assessing whether the State presented sufficient evidence to prove the defendant's guilt beyond a reasonable doubt, circumstantial evidence is considered equally probative as direct evidence. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Accordingly, a defendant's guilt may be established by circumstantial evidence alone. *See Guevara*, 152 S.W.3d at 49; *Clayton* 235 S.W.3d at 778. Further, "[e]ach fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction."

*Nisbett*, 552 S.W.3d at 262. And the evidence need not negate every conceivable alternative to a defendant's guilt to be sufficient. *David v. State*, 663 S.W.3d 673, 678 (Tex. Crim. App. 2022).

We apply the same standard of legal sufficiency in determining whether a trial court erred in denying a motion for directed verdict, as such a motion is effectively a challenge to the sufficiency of the evidence. *See Canales v. State*, 98 S.W.3d 690, 693 (Tex. Crim. App. 2003) (citing *Jackson*, 443 U.S. at 307). We will therefore affirm a trial court's decision to deny a directed-verdict motion *"if any rational trier of fact could have found [the] element[s] of the crime beyond a reasonable doubt"* under the *Jackson* standard. *Id.*

**B. Analysis**

A person commits the offense of murder if the person: "(1) intentionally or knowingly causes the death of an individual; (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; [or] (3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, the person commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." Tex. Pen. Code Ann. § 19.02(b). As set forth above, the State alleged all three statutory means by which Appellant committed Jones-Aguilar's murder, and the jury was properly instructed that it could convict Appellant of murder if it found beyond a reasonable doubt that Appellant committed murder by any of those three alternative means. *See Ngo v. State*, 175 S.W.3d 738, 746, n. 27(Tex. Crim. App. 2005) (en banc) (recognizing that the gravamen of the offense of murder, on which the jury must be unanimous, is causing the death of a person, but that the jury need not be unanimous on the "manner and means" by which the murder occurred); *see also*

9

*Gamboa v. State*, 296 S.W.3d 574, 583–84 (Tex. Crim. App. 2009) (recognizing that in homicide cases, the State may allege "alternate methods" of committing the same offense) (citing *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) (en banc)).

And when as here, the jury returns a general verdict finding a defendant guilty of murder, a reviewing court may uphold the defendant's conviction if "the evidence is sufficient to support a finding under any of the paragraphs submitted." *Manrique v. State*, 994 S.W.2d 640, 642 (Tex. Crim. App. 1999) (en banc) (the jury's "verdict will be applied to the paragraph finding support in the facts") (citing *Aguirre v. State*, 732 S.W.2d 320 (Tex. Crim. App. 1987); *see also Cardenas v. State*, No. 08-18-00083-CR, 2021 WL 3629990, at *4 (Tex. App.—El Paso Aug. 17, 2021, no pet.) (not designated for publication) (recognizing same). In our analysis, we focus on the third means alleged in the indictment, i.e., that Appellant committed felony murder by causing Jones-Agular's death "in the course of intentionally and knowingly committing a felony, namely Deadly Conduct" by "holding a firearm with [his] finger on the trigger and discharge[ing] that firearm into a crowd of individuals."

A person commits felony murder if he "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, the person commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." Tex. Pen. Code Ann. § 19.02(b)(3). As the Texas Court of Criminal Appeals has explained, felony murder is, "an unintentional murder committed in the course of committing a felony." *Rodriguez v. State*, 454 S.W.3d 503, 507 (Tex. Crim. App. 2014) (citing *Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim. App. 1999)). The state must prove the elements of the underlying felony, including the culpable

10

mental state for that felony, but no culpable mental state is required for the murder committed. *Lomax v. State*, 233 S.W.3d 302, 306–07 (Tex. Crim. App. 2007). In other words, "it is the underlying felony itself, and not the felony-murder statute, that determines whether the underlying felony requires a culpable mental state." *Id.* at 307.

Here, the underlying felony alleged in the indictment is "deadly conduct," which is committed when a person "knowingly discharges a firearm at or in the direction of . . . one or more individuals." Tex. Penal Code Ann. § 22.05(b)(1); *see also Yandell v. State*, 46 S.W.3d 357, 361–62 (Tex. App.—Austin 2001, pet. ref'd) (recognizing that the felony offense of deadly conduct may serve as the underlying felony for proof of felony-murder); *Washington v. State*, 417 S.W.3d 713, 721 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (recognizing same). Thus, the culpable mental state needed to support Appellant's conviction under a felony-murder theory was that he acted "knowingly" in discharging the firearm into a crowd of individuals, as alleged in the indictment. *See Freeland v. State*, No. 05-02-01746-CR, 2003 WL 22456353, at *2 (Tex. App.— Dallas Oct. 30, 2003, no pet.) (not designated for publication) (to prove deadly conduct, the State must show that the actor knowingly discharged a firearm). Texas Penal Code § 6.03 provides that "[a] person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." Tex. Pen. Code Ann. § 6.03 (b). Thus, a person's awareness that he is discharging a firearm in the direction of an individual or crowd of individuals is sufficient to support an inference that he acted with the requisite mental state to support a conviction for deadly conduct. *See Wheaton v. State*, 129 S.W.3d 267, 273 (Tex. App.—Corpus Christi–Edinburg 2004, no pet.) (where evidence supported an inference that defendant fired his

11

gun in the direction of his wife following an argument, defendant was properly convicted of deadly conduct); *Miles v. State*, No. 14-10-00882-CR, 2012 WL 2356478, at *2 (Tex. App.—Houston [14th Dist.] June 21, 2012, pet. ref'd) (mem op., not designated for publication) (evidence supported an inference that defendant acted knowingly in discharging his firearm, where, following an argument with various individuals, he knocked on their apartment door and opened fire, killing the complainant).

### 1. Appellant's claim that the shooting was an "accident"

Appellant contends the State failed to prove that he knowingly discharged the firearm, claiming the evidence supported an inference that the shooting was an "accident." Appellant testified repeatedly that the shooting was an accident, that he was not aware his fingers were on the trigger when the rifle discharged and struck Jones-Aguilar, and that he did not have "the mindset" or "intent" to pull the trigger at that time. Appellant calls the video of the shooting "anything but dispositive" of the intent question.

As a preliminary matter, "the defense of accident is no longer present in the penal code," but a defendant may claim his actions were not the result of "voluntary conduct." *See Brown v. State*, 955 S.W.2d 276, 280 (Tex. Crim. App. 1997) (en banc) (citing Tex. Pen. Code Ann. § 6.01(a) ("a person commits an offense only if he engages in voluntary conduct, including an act, an omission, or possession"). And the Texas Court of Criminal Appeals has long recognized, a "homicide that is not the result of voluntary conduct is not to be criminally punished." *Brown*, 955 S.W.2d at 280 (citing *Alford v. State*, 866 S.W.2d 619, 622–24 (Tex. Crim. App. 1993) (en banc) and the cases cited therein)). But the court also recognizes, the "issue of the voluntariness of one's conduct, or bodily movements, is separate from the issue of one's mental state." *Id.* (citing

*Adanandus v. State*, 866 S.W.2d 210, 230 (Tex. Crim. App. 1993); *see also Soria v. State*, No. 08-20-00074-CR, 2022 WL 2965979, at *11 (Tex. App.—El Paso July 27, 2022, no pet.) (not designated for publication) (recognizing same).

In general, "[v]oluntariness is a low threshold," and "[e]ven accidental or unintentional movements and actions are voluntary." *Rodriguez v. State*, 629 S.W.3d 229, 234 (Tex. Crim. App. 2021). "Only if an outside force directly causes the movement, or if the movement is the result of truly nonvolitional action, such as a muscle spasm, will an action be deemed involuntary." *Id*. (finding no evidence that defendant involuntarily discharged the firearm causing the victim's death); *see also McFarland v. State*, 928 S.W.2d 482, 513 (Tex. Crim. App. 1996) (en banc), *abrogated on other grounds*, by *Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998) (en banc) (finding no evidence that appellant's conduct in discharging a firearm was not voluntary). Here, despite his blurry memory, Appellant acknowledged that he must have pulled the trigger when it discharged the fatal bullet, as he was admittedly holding the rifle at the time. He presented no evidence to support an inference that an outside force caused him to pull the trigger involuntarily.[6]

### 2. Appellant's claim that he did not act "knowingly" in discharging the rifle

Appellant correctly notes that the record lacks direct evidence of his mental state during the shooting. But the record contains sufficient circumstantial evidence from which the jury could

---

[6] At trial, Appellant testified he was "highly intoxicated" on the day of the shooting. But as the jury was properly instructed, voluntary intoxication does not serve as a defense to the commission of a crime, nor does it serve to negate the "*mens rea* elements of intent or knowledge." *See Jimenez v. State*, 507 S.W.3d 438, 440 (Tex. App.—Fort Worth 2016, no pet.) (citing Tex. Penal Code Ann. § 8.04(a) ("Voluntary intoxication does not constitute a defense to the commission of [a]crime."); *Hawkins v. State*, 605 S.W.2d 586, 589 (Tex. Crim. App. [Panel Op.] 1980)); *see also Craig v. State*, 594 S.W.2d 91, 96 (Tex. Crim. App. [Panel Op.] 1980) (holding that defendant's voluntary intoxication did not constitute a defense to the commission of aggravated assault). Accordingly, it would not be a valid defense to claim he "accidentally" pulled the trigger due to his voluntary intoxication.

have found that he acted "knowingly" when he discharged the rifle into the crowd. *Nisbett*, 552 S.W.3d at 267 (reinforcing that the State is not required to produce direct evidence of a defendant's mental state to support a murder conviction). Instead, by its very nature, a defendant's "culpable mental state must generally be inferred from the circumstances," as neither the jury nor a reviewing court can "read an accused's mind." *Id.* Therefore, absent a confession, a defendant's mental state must be inferred "from his acts, words, and conduct." *Id.* at 267 (quoting *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991) (en banc)); *see also Romano v. State*, 610 S.W.3d 30, 35 (Tex. Crim. App. 2020) (recognizing same). This is because "[o]ne's acts are generally reliable circumstantial evidence of one's intent." *Laster v. State*, 275 S.W.3d 512, 524 (Tex. Crim. App. 2009). As we have previously recognized, both "[i]ntent and knowledge are fact questions for the jury and are almost always proven through the circumstances surrounding the crime." *Collins v. State*, No. 08-15-00103-CR, 2017 WL 192913, at *5 (Tex. App.—El Paso Jan. 18, 2017, pet. ref'd) (not designated for publication) (citing *Manrique*, 994 S.W.2d at 649); *see also Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (recognizing that "in homicide prosecutions, the defendant's state of mind is a question of fact that must be determined by the jury").

Here, the jury was presented with multiple circumstances from which it could have inferred that Appellant acted "knowingly" in discharging his AR-15 into the crowd. *Miles*, 2012 WL 2356478, at *2 ; *Wheaton*, 129 S.W.3d at 124. Appellant acknowledged bringing a rifle to the confrontation where the crowd was gathered with the intent of de-escalating the situation. He acknowledged he was holding the rifle when it discharged into the crowd and struck Jones-Aguilar. He acknowledged subsequently shooting the rifle into the air to "scare everyone away." To determine whether Appellant acted with the requisite intent, we look at all "events occurring

14

before, during and after the commission of the offense," and we "may rely on [the] actions of the defendant which show an understanding and common design to do the prohibited act." *Guevara*, 152 S.W.3d at 49. Given Appellant's admittedly intentional conduct both before and after the fatal shooting, the jury could have inferred that his action in firing the fatal shot was done knowingly—if not intentionally. *See Wheaton*, 129 S.W.3d at 274 (recognizing that a fact-finder may consider the "circumstances surrounding the act" in considering whether a defendant acted knowingly in discharging a firearm); *see also Miles*, 2012 WL 2356478, at *1 (affirming deadly conduct conviction despite Appellant's account that, in response to three men confronting him, "[h]e retrieved a loaded firearm from his waist band to scare and ward [them] off" but when trying to escape, "he stumbled and hit his hand on a corner of the building. The firearm accidentally discharged, and he fled the scene.").

Immediately after the shooting, Appellant fled the scene and purchased a bus ticket the next day to get out of town as "as soon as possible." "Evidence of flight is indicative of a consciousness of guilt and it is a circumstance from which an inference of guilt may be drawn." *In re J.A.B.*, 440 S.W.3d 818, 823 (Tex. App.—El Paso 2013, no pet.) (citing *Clay v. State*, 240 S.W.3d 895, 905 n. 11 (Tex. Crim. App. 2007)); *see also Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994) ("Evidence of flight or escape is admissible as a circumstance from which an inference of guilt may be drawn.").

Additionally, Appellant attempted to conceal evidence by removing the license plates from the vehicle he was driving and attempting to hide it in Las Cruces. "Attempts to conceal incriminating evidence" are "probative of wrongful conduct and are also circumstances of guilt."

15

*Guevara*, 152 S.W.3d at 50 (citing *Graham v. State*, 566 S.W. 2d 941, 951 (Tex. Crim. App. 1978);
*United States v. Cano–Guel*, 167 F. 3d 900, 905 (5th Cir. 1999)).

Finally, Appellant initially lied to police regarding his whereabouts on the day in question and made statements inconsistent with his trial testimony—such as the manner in which he disposed of the rifle. *See Guevara*, 152 S.W.3d at 50 (recognizing that a defendant's false or inconsistent statements may support an inference of guilt); *see also Padilla v. State*, 326 S.W.3d 195, 201 (Tex. Crim. App. 2010) (holding that a rational fact-finder can consider a defendant's untruthful statements as evidence of the defendant's guilt); *Gear v. State*, 340 S.W.3d 743, 747 (Tex. Crim. App. 2011) (recognizing same).

We therefore conclude there was legally sufficient evidence from which a rational juror could infer that Appellant acted knowingly in discharging his firearm into a crowd of individuals—an act clearly dangerous to human life—which caused the death of Jones-Aguilar. Thereby supporting his conviction under a felony-murder theory of guilt.[7]

Appellant's Issue One is overruled.

### CRIMINALLY NEGLIGENT HOMICIDE

Appellant next argues in the alternative that we should reform the trial court's judgment to reflect a judgment of conviction for the lesser-included offense of criminally negligent homicide. That lesser-included offense does not require a finding that the defendant acted intentionally or knowingly in causing his victim's death.[8] Appellant asserts that when an appellate court

---

[7] Given our conclusion that there was legally sufficient evidence to support the jury's verdict under a felony-murder theory of guilt, we do not consider whether Appellant had the requisite intent to either kill or cause serious bodily injury to Jones-Aguilar under the first two paragraphs in the indictment.

[8] The Penal Code provides that a person commits the offense of criminally negligent homicide if he "causes the death

16

determines insufficient evidence supports a finding of guilt for the convicted offense, rather than rendering an "outright acquittal," the court may reform the judgment to reflect a conviction for a lesser-included offense when the evidence supports the elements of that offense. This is true. *See Thornton*, 425 S.W.3d at 299–300.

However, it is only appropriate to reform a judgment of conviction to a lesser-included offense when legally insufficient evidence supports the jury's finding of guilt for the greater offense. *See Langs v. State*, 664 S.W.3d 155, 163 (Tex. Crim. App. 2022) (recognizing that a court must first determine there is legally insufficient evidence to support a conviction for a greater offense before conducting a reformation analysis); *see also Liller v. State*, No. 08-16-00309-CR, 2018 WL 3583877, at *6 (Tex. App.—El Paso July 26, 2018, pet. ref'd) (not designated for publication) (declining to enter a judgment of acquittal or reform the defendant's murder conviction to a lesser-included offense of manslaughter or criminally negligent homicide where legally sufficient evidence supported the culpable-mental-state element of murder); *Edward v. State*, 635 S.W.3d 649, 659 (Tex. Crim. App. 2021) (finding court of appeals erred in reforming defendant's conviction for greater offense of assault family violence to the lesser-included offense

---

of an individual by criminal negligence." Tex. Pen. Code Ann. § 19.05(a). And in turn, the Code provides that a "person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.* § 6.03 (d). As set forth above, the trial court instructed the jury that if it did not find that the State proved Appellant committed the offense of murder beyond a reasonable doubt, it could consider whether he was guilty of the lesser offense of criminal negligence homicide. However, the jury rejected that option when it found Appellant guilty of the greater offense of murder.

of misdemeanor assault where the State presented sufficient evidence to support his conviction for the greater offense).

Because we conclude that sufficient evidence supported Appellant's conviction for the greater offense of murder, reformation is inappropriate. Appellant's Issue Two is overruled.

## CONCLUSION

The trial court's judgment is affirmed.

LISA J. SOTO, Justice

April 12, 2024

Before Alley, C.J., Palafox and Soto, JJ.

(Do Not Publish)